**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 04-5062**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

DANIEL LEE THOMPSON,

Defendant - Appellant.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Leonie M. Brinkema, District Judge. (CR-03-530)

_____

Argued: February 3, 2006          Decided: July 25, 2006

_____

Before WILKINS, Chief Judge, and WILLIAMS and SHEDD, Circuit Judges.

_____

Affirmed by unpublished opinion. Judge Shedd wrote the opinion, in which Chief Judge Wilkins and Judge Williams concurred.

_____

**ARGUED:** Amy Lynn Tenney, JENNER & BLOCK, Washington, D.C., for Appellant. Linda I. Marks, UNITED STATES DEPARTMENT OF JUSTICE, Office of Consumer Litigation, Washington, D.C., for Appellee. **ON BRIEF:** Julie M. Carpenter, JENNER & BLOCK, Washington, D.C., for Appellant. Paul J. McNulty, United States Attorney, Karen L. Taylor, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

SHEDD, Circuit Judge:

Daniel L. Thompson appeals his conviction and sentence for violating the Controlled Substances Act (the "CSA"), 21 U.S.C. § 801 et seq. We affirm.

I.

In the mid-1990s, Dr. Thompson was a physician licensed to practice medicine by the State of Ohio and was authorized by the Drug Enforcement Administration to prescribe controlled substances. Dr. Thompson and Vineet Chhabra, a businessman, founded and operated weight loss centers in Ohio. Over a two-year period, Dr. Thompson treated more than 3,000 patients suffering from obesity in these centers and never refused to prescribe medication to them based on diagnostic testing.

After obtaining an opinion from their attorney that such a practice would be lawful, Dr. Thompson and Chhabra created a website offering medications controlled under the CSA for the treatment of obesity. Rather than travel to Dr. Thompson's weight-loss centers, individuals would submit information relating to their medical history and current ailment over the internet. Based on the information provided over the internet, Dr. Thompson would prescribe controlled substances to these patients. For the next several months, Dr. Thompson earned more than $50,000 per month from his internet practice. Chhabra also established similar

relationships with other physicians and pharmacists to offer controlled substances over the internet.

In the late 1990s, Ohio promulgated regulations requiring physicians to perform physical examinations before prescribing controlled substances to Ohio residents for the treatment of obesity. In 2000, Dr. Thompson pleaded guilty in Ohio state court to violating the Ohio regulations. As part of his plea agreement, Dr. Thompson surrendered his medical license and DEA registration. After Dr. Thompson stopped prescribing medications, his brother, Dr. William Thompson, a physician licensed in Missouri, replaced Dr. Thompson as the prescribing physician for the internet practice.

In 2003, the government indicted Chhabra, Dr. Thompson, his brother, and several other physicians and pharmacists for conspiring to violate the CSA by distributing and dispensing controlled substances other than for a legitimate medical purpose and not in the usual course of professional practice. The indictment alleged that the defendants failed to check the accuracy of the information the patients provided over the internet, including their identities, ages, and qualifying medical condition. It further alleged that the defendants provided controlled substances even when no physician reviewed the information provided by the patients.

4

Before his arraignment, Dr. Thompson provided a financial affidavit to the district court "in case bail becomes an issue." J.A. 213. In his cover letter, Dr. Thompson informed the court:

> I have no attorney and intend on defending myself. The attorney listed, David Winters, will not be defending me because of financial problems with regards to another defendant. . . . Chhabra had been paying Mr. Winters legal fees and that is no longer the case. I believe Mr. Winters has already notified the prosecution of these events and they know that I will be defending this case pro se.

Id. Dr. Thompson's financial affidavit revealed that he was then unemployed, had less than $500 in assets, received only $1,000 each month from a trust account, and had more than $1.3 million in debt.

By the time of the arraignment in December 2003, the district court appointed counsel for two of Dr. Thompson's nonphysician codefendants. The district court concluded, however, that Dr. Thompson and his brother did not qualify for court-appointed counsel. Even though Dr. Thompson's financial affidavit showed that he had virtually no assets, the district court recommended that Dr. Thompson "liquidat[e] whatever assets you have to find counsel for yourself." J.A. 190. The district court also warned Dr. Thompson that:

> It's a risky business acting as your own attorney, but the law gives you the right to do so. If you are your own attorney, you should understand that as you speak, you may be making admissions or statements that the prosecution can use against you. You're going to definitely have a disadvantage in being able to defend yourself, but it is your right under the Faretta decision and under the Sixth Amendment. And while I'll permit you to be your own attorney, you will have to follow all the

5

rules and regulations of the Court.  We'll give you very little extra slack, a little bit, but you understand if you proceed at your own risk, you are a doctor, so you're well educated, so I have no doubt that you can adequately represent yourself, but there's nothing like having a lawyer.

J.A. 190-91.  Dr. Thompson responded that he was "comfortable" representing himself.  J.A. 191.  Dr. Thompson entered a plea of not guilty and requested a jury trial.  The district court explained to Dr. Thompson his rights under the Speedy Trial Act. Dr. Thompson stated that he understood his rights, and he expressly waived them.

For the next several months, Dr. Thompson represented himself. Because Dr. Thompson was living in South Dakota and could not afford to travel, he missed some of the pretrial hearings.  Dr. Thompson did, however, file substantive motions to dismiss. Although these motions were filed after the applicable deadline, the district court considered and denied them on the merits.

In June 2004, Dr. Thompson moved for "indigency status for all remaining parts of this criminal trial."  J.A. 321.  He explained that he "did not request indigency status at [the arraignment] because I was not aware of the personal financial hardship this trial would place on my limited financial resources."  Id.  Dr. Thompson was concerned that the district court would misinterpret his absence from pretrial hearings as indifference or contempt for the court.  Dr. Thompson did not specify the exact relief he was seeking.

6

The district court deemed Dr. Thompson's motion for indigency status as a request for appointed counsel. The district court reexamined the financial affidavit that Dr. Thompson submitted before the arraignment and determined that Dr. Thompson qualified for court-appointed counsel. The district court promptly appointed counsel for Dr. Thompson. During the brief period in which Dr. Thompson was represented, his appointed counsel obtained a draft plea agreement and an estimated guideline range calculation for Dr. Thompson from the government. That estimate showed that Dr. Thompson's guideline range would be 46 to 57 months' imprisonment. His appointed counsel warned Dr. Thompson that he potentially faced a much longer term of imprisonment if he refused to plead guilty and was found guilty at trial.

Within fifteen days of having counsel appointed, Dr. Thompson moved to be restored to pro se status. Dr. Thompson explained that he did not request a court-appointed counsel at his arraignment, because "I wanted to defend myself," and that his recent motion for indigency status was not meant as a request for counsel. J.A. 355. Dr. Thompson insisted that the counsel appointed to represent him was more of a hindrance than a help and "has made me feel compassion for those indigent defendants incapable of attempting a pro se defense." Id. Dr. Thompson further emphasized that he had "never requested court appointed counsel," that he had always "intended on being allowed the right to cross examine the

7

prosecution's witnesses as well as to give my own opening and closing statements," and that "I am certain that I have a constitutional right to defend myself." J.A. 356. Dr. Thompson requested that the district court "remove my Court appointed attorney from this trial and allow me to defend myself as an indigent Pro Se defendant." J.A. 357.

In response, the district court informed Dr. Thompson that he could not receive any funding to hire expert witnesses, to travel to hearings, or to pay for other defense expenses if he returned to pro se status. The court explained that "[a]ppointing counsel is the only way that the Court can assist the defendant in defraying the costs of his legal defense." J.A. 360. The district court delayed ruling on Dr. Thompson's motion to return to pro se status to give him an opportunity to consider the ramifications to his defense of representing himself. The district court ordered Dr. Thompson to inform the court within five days if he wanted to keep his court-appointed counsel or if he instead wanted to resume his defense pro se.

About ten days later, Dr. Thompson's court-appointed counsel moved to withdraw as counsel. On the same day, the district court granted Dr. Thompson's motion to be restored to pro se status, noting that Dr. Thompson, pursuant to the court's prior order, had "informed the Court that he wishes to have his court-appointed counsel withdrawn" and that Dr. Thompson "understands the

8

implications of returning to his pro se status."  J.A. 362.  The district court also granted the court-appointed counsel leave to withdraw as counsel.  Dr. Thompson did not object to these orders.

After several of Dr. Thompson's codefendants pleaded guilty, the government filed a superseding indictment.  Shortly thereafter, Dr. Thompson filed a motion to recuse District Court Judge Brinkema from presiding over the impending trial.  Dr. Thompson alleged several different bases in support of his claim that Judge Brinkema was biased against him.  For instance, he claimed that Judge Brinkema was biased against physicians because she appointed counsel for nonphysician codefendants but denied counsel for him and his physician brother even though their net worth was substantially less than the nonphysician codefendants.  Although Dr. Thompson claimed this showed Judge Brinkema's bias, he admitted that he had "never asked for" counsel and that he did not like that the counsel Judge Brinkema eventually appointed him was put "in charge of my entire defense."  J.A. 429-30.[1]

Shortly before trial was scheduled to commence, the government entered into a plea agreement, pursuant to Fed. R. Crim. P. 11(c)(1)(C), with codefendant Chhabra, who the district court considered to be the primary leader of the conspiracy.  Pursuant to this agreement, Chhabra agreed to plead guilty to only Count 1 of

---

[1]Although the district court docket does not reflect that the district court ruled on this motion, Dr. Thompson does not argue on appeal that Judge Brinkema was biased against him.

the Superseding Indictment and to receive a 33-month term of imprisonment. The district court accepted Chhabra's binding plea agreement.

After the remaining defendants pleaded guilty, only Dr. Thompson, his brother, and two other defendants proceeded to trial. Both Dr. Thompson and his brother appeared pro se. The government attempted to prove six counts against Dr. Thompson. Count 1 alleged that Dr. Thompson knowingly and intentionally conspired with others to distribute and dispense controlled substances other than for a legitimate medical purpose and not in the usual course of professional practice. The five other counts alleged that Dr. Thompson knowingly and intentionally illegally distributed and dispensed controlled substances on five particular occasions.

Dr. Thompson was allowed to give his opening statement. He told the jury that he was representing himself because he "absolutely hate[s] attorneys." J.A. 497. Dr. Thompson was also allowed to cross examine all of the witnesses who testified, including his brother, who was qualified as an expert witness in the field of internal medicine.

The jury found Dr. Thompson guilty of the conspiracy count and two counts of illegal distribution, but acquitted him of the remaining three illegal distribution counts. The jury acquitted or deadlocked on all the charges against the three remaining defendants.

Dr. Thompson moved for a new trial on several grounds, including that a new trial would give him the opportunity to have a court-appointed attorney from the onset to "discuss plea agreement options with the government that would perhaps be much more agreeable." J.A. 2094. Dr. Thompson insisted, however, that he "did not violate the CSA." J.A. 2123. The district court denied this motion.

The presentence report ("PSR") calculated Dr. Thompson's total offense level at 25 and placed him in criminal history category I, giving him a guideline range of 57 to 71 months. The district court, however, reduced the total offense level to 21 by lowering the drug quantity attributable to Dr. Thompson and by giving him credit for acceptance of responsibility. These rulings resulted in an adjusted guideline range of 37 to 46 months' imprisonment. The district court sentenced Dr. Thompson to 37 months' imprisonment, the minimum sentence under this guideline range, noting that this sentence "is more than sufficient, and it is also proper and appropriate in light of the sentences of the other defendants in this case." J.A. 2204.

II.

Dr. Thompson argues that the district court deprived him of his Sixth Amendment right to be represented by counsel. We disagree.[2]

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of Counsel for his defence." This right mandates that "counsel be provided for a defendant who cannot afford to retain private representation in any case in which he will be incarcerated if convicted." United States v. Singleton, 107 F.3d 1091, 1095 (4th Cir. 1997). Although courts must protect a defendant's right to counsel, Johnson v. Zerbst, 304 U.S. 458, 465 (1938), courts must also take care not to force counsel upon a defendant because the Sixth Amendment also gives a defendant the right to represent himself, Faretta v. California, 422 U.S. 806, 807 (1975). "[T]he right to self-representation . . . derives from the Sixth Amendment principle wherein the defendant has the right to decide the type of defense he will mount." United States v. Gonzalez-Lopez, 399 F.3d 924, 934-35 (8th Cir. 2005), aff'd, ___ U.S. ___, 2006 WL 1725573 (2006). The defendant can waive the right to counsel if his waiver is knowing, intelligent, and voluntary. Zerbst, 304 U.S. at 468; Singleton, 107 F.3d at 1095.

_____

[2]Dr. Thompson raises other assignments of error, but we conclude that they also lack merit.

12

The right to counsel and the right to self-representation are mutually exclusive, and therefore "the assertion of one constitutes a de facto waiver of the other." Singleton, 107 F.3d at 1096.

Determining whether a defendant sufficiently waived his right to counsel is a question of law that we review de novo. United States v. Owen, 407 F.3d 222, 225 (4th Cir. 2005). "The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Zerbst, 304 U.S. at 464. In deciding whether the defendant's waiver of counsel was sufficient, we examine the entire record. Singleton, 107 F.3d at 1097; Townes v. United States, 371 F.2d 930, 934 (4th Cir. 1966). While it is incumbent upon the trial court to determine that a defendant's waiver of his right to counsel is knowing and intelligent, no particular form of colloquy is required. Townes, 371 F.2d at 934. The court must make the defendant aware of the "dangers and disadvantages of self-representation," Faretta, 422 U.S. at 835, so that the defendant "knows what he is doing and his choice is made with eyes open." Adams v. United States ex rel. McCann, 317 U.S. 269, 279 (1942). "The defendant must be made aware that he will be on his own in a complex area where experience and professional training are greatly to be desired." United States v. King, 582 F.2d 888, 890 (4th Cir. 1978).

13

Dr. Thompson argues that the district court erred by refusing to offer him counsel before his arraignment and by giving him no choice except to represent himself. We agree that the district court erred by deciding at the arraignment that Dr. Thompson did not qualify financially for appointed counsel.[3] There is no dispute that Dr. Thompson qualified financially to be appointed counsel at every stage of the proceeding.[4]

While we agree that the district court erred, that does not end our inquiry because we are required to review the entire record to determine whether a defendant waived his right to counsel. See Singleton, 107 F.3d at 1097. Under the unique circumstances of this case, we conclude that Dr. Thompson knowingly, intelligently, and voluntarily waived his right to counsel.

When Dr. Thompson provided a financial affidavit to the district court before his arraignment, he explained in his cover letter that it was for purposes of setting bail rather than for qualifying for appointed counsel. Dr. Thompson specifically informed the district court in his cover letter that he "intend[ed] on defending myself." J.A. 213.

---

[3]We do not decide that an arraignment is a "critical stage" at which the right to counsel applies. See Owen, 407 F.3d at 225 (assuming, without deciding, that an arraignment is a "critical stage"). We decide only that the district court erred in its initial factual determination that Dr. Thompson did not qualify financially to be appointed counsel.

[4]The government has not produced any evidence suggesting that Dr. Thompson's financial affidavit was fraudulent or incorrect.

14

From the transcript of the arraignment, it is clear that the district court understood, based on Dr. Thompson's letter, that Dr. Thompson wanted to represent himself. The district court recognized in the colloquy that Dr. Thompson was highly educated and could adequately represent himself, but it thoroughly warned Dr. Thompson that he would be at a disadvantage if he chose to represent himself. Despite these warnings, Dr. Thompson stated that he was "comfortable" representing himself. J.A. 191.

Subsequent events confirm that Dr. Thompson knowingly, intelligently, and voluntarily waived his right to counsel. As trial drew closer, Dr. Thompson moved for indigent status apparently in an effort to obtain travel and defense expenses. The district court misinterpreted this motion as a request for appointed counsel. After reexamining Dr. Thompson's financial affidavit and determining that he qualified, the district court appointed counsel for Dr. Thompson. Almost immediately, however, Dr. Thompson requested that his counsel be removed not only because Dr. Thompson felt the counsel was not helpful but also because he "never requested court appointed counsel" and wanted to "defend myself." J.A. 356-57. Dr. Thompson stated unequivocally: "I am certain that I have a constitutional right to defend myself." J.A. 356. In a subsequent filing, Dr. Thompson further explained that he was opposed to having counsel appointed because he did not want

15

an attorney placed "in charge of my entire defense."   J.A. 429-430.[5]

From our review of the entire record, we conclude that Dr. Thompson validly invoked his Sixth Amendment right to represent himself from the beginning of this case.  Although the district court erred by not initially offering him counsel, the district court reasonably and correctly believed, based on Dr. Thompson's pre-arraignment letter and his comments at the arraignment, that Dr. Thompson intended to represent himself.  The record as a whole verifies that had the district court offered Dr. Thompson appointed counsel at the arraignment, he would have declined such an offer because he insisted throughout the proceeding that he be allowed to represent himself and control his own defense.   Dr. Thompson's post-arraignment statements confirm that the district court's understanding at the time of the arraignment – that Dr. Thompson

---

[5]After indicating at the arraignment that he would represent himself, Dr. Thompson requested an advisory counsel to assist him. That request was denied.  In his motion to return to pro se status after the district court appointed him counsel, Dr. Thompson insisted that "I specifically stated I planned on defending myself Pro Se during my arraignment and that the Court could provide me with co-counsel if [it] felt it would make the trial go smoother." J.A. 356.  These statements confirm that Dr. Thompson intended to represent himself from the beginning of the proceedings against him and that he wanted, at most, an advisory counsel who could advise him but who would not be in charge of his defense.  Refusal by a district court to appoint advisory counsel is not a cognizable Sixth Amendment violation.  Singleton, 107 F.3d at 1100-01.

16

wanted to represent himself – was entirely correct.[6]  Dr. Thompson never deviated from asserting his right to represent himself and to control his defense until after the jury found him guilty. By invoking his Sixth Amendment right to represent himself, Dr. Thompson knowingly, intelligently, and voluntarily waived his right to counsel.  See Singleton, 107 F.3d at 1096.


                              III.

     We affirm the judgment of the district court.

                                                    AFFIRMED

_____

     [6]Dr. Thompson argues that we cannot consider his post-arraignment statements in determining whether he validly waived his right to counsel.  He relies on our statement in Singleton that we review the validity of a waiver based only on what the trial court knew "at the time" of the waiver.  Id. at 1097.  The context of this statement in Singleton, however, reveals that Dr. Thompson's reliance is misplaced.  Singleton does not address or limit the consideration of post-waiver information.  Instead, Singleton stands for the proposition that reviewing courts are not limited to considering what the district court ascertained only "at the time" of the waiver colloquy but can also consider "the record as a whole." Id.  We need not decide whether Singleton allows us to consider Dr. Thompson's post-arraignment statements to determine in the first instance whether Dr. Thompson validly waived his right to counsel.  We base our determination that Dr. Thompson validly waived his right to counsel on his pre-arraignment letter and his comments during the arraignment.  Dr. Thompson's post-arraignment statements merely confirm his waiver.  Consideration of these subsequent confirming statements is not inconsistent with Singleton.

                              17